UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     v.

THOMAS WHITTLE,

               Defendant.

18 Cr. 36 (JPO)

## DEFENDANT THOMAS WHITTLE'S SENTENCING MEMORANDUM

BRADLEY J. BONDI
NOLA B. HELLER
SEAN P. TONOLLI
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY  10005
Telephone: (212) 701-3000

*Attorneys for Defendant Thomas Whittle*

TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ............................................................................1

II.  TOM'S BACKGROUND AND CHARACTER ..................................................1

    A.  Tom's Steadfast Dedication to His Family ...............................................2

    B.  Tom's Professional Life............................................................................7

III. THE OFFENSE CONDUCT ...............................................................................8

IV.  THE PRESENTENCE REPORT'S GUIDELINES CALCULATION AND
    RECOMMENDATION .......................................................................................9

V.   SENTENCING ANALYSIS...............................................................................10

    A.  A Non-Custodial Sentence Is Warranted Because Tom Provided Substantial
       Assistance to the Government ................................................................11

       1.  The Significance and Usefulness of Tom's Assistance ...............11

       2.  The Truthfulness, Completeness, and Reliability of Tom's Information and
          Testimony .......................................................................................13

       3.  The Nature and Extent of Tom's Assistance ...............................14

       4.  Injury Suffered Resulting from Tom's Cooperation....................15

       5.  The Timeliness of Tom's Assistance ...........................................16

    B.  A Non-Custodial Sentence Would Be Fair and Appropriate Under Title 18,
       United States Code, Section 3553 (a) ....................................................16

       1.  Tom's Personal History and Characteristics Justify a Sentence of Time Served
          Under Title 18, United States Code, Section 3553 (a)(1)............17

       2.  A Non-Custodial Sentence Would Promote Respect for the Law, Provide
          Specific and General Deterrence, and Protect the Public ...........18

       3.  A Non-Custodial Sentence Would Avoid Unwarranted Sentencing Disparities........20

    C.  The Sentencing Guidelines Overstate the Seriousness of this Atypical Offense...............22

    D.  A Custodial Sentence Would Expose Tom to the Potential Risk of Serious Illness
       Caused by COVID-19................................................................................23

VI.  CONCLUSION..................................................................................................25

TABLE OF AUTHORITIES

**Cases**

*United States* v. *Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) ................................................................................................ 22

*United States* v. *Booker*, 543 U.S. 220 (2005) ............................................................. 10

*United States* v. *Cavera*, 550 F.3d 180 (2d Cir. 2008) …………………………………………..10

*United States* v. *Cooper*, No. 13 Cr. 66 (JPO), 2020 WL 4195273 (S.D.N.Y. June 11, 2020).... 24

*United States* v. *Gaind*, 829 F. Supp. 669 (S.D.N.Y. 1993) ........................................ 19

*United States* v. *Galante*, 111 F.3d 1029 (2d Cir. 1997) ............................................ 18

*Gall* v. *United States*, 552 U.S. 38 (2007)…..…………………………………………………..10

*United States* v. *Park*, 456 F. Supp. 3d 557 (S.D.N.Y. Apr. 24, 2020) .................................... 24n

*United States* v. *Stewart*, 590 F.3d 93 (2d Cir. 2009)............................................. 10, 18

*United States* v. *Thavaraja*, 740 F.3d 253 (2d Cir. 2014) ......................................... 10

**Statutes**

18 U.S.C. § 3553(a) ...................................................................................................... 10

18 U.S.C. § 3663A(c)(1)(B) ........................................................................................... 9

U.S.S.G. § 5K1.1 .......................................................................................................... 11

**Other Authorities**

*A State-by-State Look at Coronavirus in Prisons*, Marshall Project, https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons ..................................................................................................................... 24n

Brendan Saloner, Ph.D., et al., Research Letter, *COVID-19 Cases and Deaths in Federal and State Prisons*, 324 JAMA 602 (2020), *available at* https://jamanetwork.com/journals/jama/fullarticle/2768249 ........................................... 23n, 24

Chad Bray, *KPMG Fires 6 Over Ethics Breach on Audit Warnings*, N.Y. TIMES (Apr. 12, 2017) .................................................................................................................... 19n

*COVID-19 and Autoimmune Disease: What We Know*, Global Autoimmune Institute, https://www.autoimmuneinstitute.org/covid-19-autoimmune-disease-what-we-know-now/  23n

*COVID-19 Hospitalization and Death by Age*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html ...................... 23n

Dave Michaels, et al., *KPMG Fires Partners Over Leak of Audit Regulator's Confidential Plan*, WALL ST. J. (Apr. 11, 2017) ............................................................................... 19n

Judgment, Dkt. No. 20, *United States* v. *Parietti*, No. 16 Cr. 373 (PAE) (S.D.N.Y. Feb. 13, 2019) ..................................................................................................................... 21

Judgment, Dkt. No. 22, *United States* v. *Johnston*, No. 16 Cr. 406 (ALC) (S.D.N.Y. Jan. 25, 2018) ..................................................................................................................... 21

Judgment, Dkt. No. 26, *United States* v. *Curtler*, No. 15 Cr. 670 (CM) (S.D.N.Y. Apr. 10, 2019) ........................................................................................................................................ 21

Judgment, Dkt. No. 261, *United States* v. *Cunniffe et. al.*, No. 15 Cr. 287 (LTS) (S.D.N.Y. Nov. 8, 2017) ........................................................................................................................ 22

Judgment, Dkt. No. 282, *United States* v. *Robson et. al.*, No. 14 Cr. 272 (JSR) (S.D.N.Y. Mar. 13, 2017) ...................................................................................................................... 22

Mark Maurer, *Another Former KPMG Executive Pleads Guilty in 'Steal the Exam' Scheme*, WALL ST. J. (Oct. 4, 2019) ...................................................................................... 19n

Matthew Goldstein, *U.S. Accuses Accountants of Trying to Game Reviews of KPMG Audits*, N.Y. TIMES (Jan. 22, 2018) ...................................................................................... 19n

*Men and COVID-19: A Biopsychosocial Approach to Understanding Sex Differences in Mortality and Recommendations for Practice and Policy Interventions*, CDC, https://www.cdc.gov/pcd/issues/2020/20_0247.htm .......................................................... 23n

Michael Rapoport, *Former KPMG Partner Pleads Guilty in Scheme to Obtain Secret Regulatory Information*, WALL ST. J. (Oct. 30, 2018) .......................................................... 19n

Michael Rapoport, *KPMG Ex-Partner Convicted In 'Steal the Exam' Scandal*, WALL ST. J. (Mar. 11, 2019) ...................................................................................................... 19n

Michael Rapoport, *KPMG Ex-Partner Goes on Trial in 'Steal the Exam' Scandal*, WALL ST. J. (Feb. 11, 2019) ...................................................................................................... 19n

*Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html ............................................................................................................ 23n

Stuart A. Kinner et al., Comment, *Prisons and Custodial Settings are Part of a Comprehensive Response to COVID-19*, 5 Lancet E188 (2020), *available at* https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(20)30058-X/fulltext. .... 24n

Sweet Sentencing Tr., *United States* v. *Sweet*, No. 18 Cr. 8 (S.D.N.Y. Nov. 20, 2020) ................................................................................. 20n, 21n, 24n

Defendant Thomas Whittle respectfully submits this memorandum in connection with his sentencing, which is scheduled for December 2, 2020.

## I.    PRELIMINARY STATEMENT

Tom Whittle has led a life devoted to his family, his work, and his community.  He is a loving son, husband, father, uncle, and friend who has had a lengthy and distinguished career in the public accounting profession.  That career is now over because, by virtue of his actions, he can no longer practice as an accountant.  He deeply regrets the conduct that brings him before the Court for sentencing, which was a complete anomaly in the context of the rest of his life.  Tom has worked diligently to atone for his wrongdoing by cooperating extensively with the government in this case—cooperation that proved critical to the government's convictions at the trial of David Middendorf and Jeffrey Wada.  Tom has learned from his mistake, and he will never commit another crime.  We therefore respectfully submit that a sentence of time served, as the Probation Office has recommended, would be fair and appropriate in this case.

## II.    TOM'S BACKGROUND AND CHARACTER

As demonstrated by the many letters submitted by Tom's family members, friends, and former colleagues, Tom has lived his life according to the highest moral standards.[1]  His younger brother Pete writes that Tom

> has always been the model of what a good brother and son should be.  Ever since I remember he was always the one doing what was "right".  He was the "A" student in school, the one who took part in debate team and theater club and the one practicing his clarinet like he was told to do.  He was the one who studied diligently and it showed.  He was a Boy Scout and I can say he lived by its creed: trustworthy, loyal, helpful, courteous, kind, obedient, cheerful, thrifty, brave, clean and reverent.  I have never known Tom not to want to do what is "right" and what is "expected."[2]

---

[1] These letters are submitted with this Memorandum as numbered exhibits.  *See* Exhibits 1-16.
[2] Letter from Pete Whittle, dated Oct. 18, 2020, at 1 (attached hereto as Exhibit 15).

Those who know Tom best all agree with this sentiment. Tom's oldest friend Mark calls Tom "one of the best people I know," and even named his own son after Tom.[3] Since childhood, Tom has put dedication to his family above his own interests, supporting his loved ones and setting an example to be admired and emulated.

**A.      Tom's Steadfast Dedication to His Family**

Tom was born in Teaneck, New Jersey on ██████, 1963 into a blue-collar and devout Roman Catholic family. Tom's father owned a construction supply and service company, and his mother was a homemaker who also helped her husband with his business. The Whittle family was loving and tight-knit. When Tom was a child, every night at dinner, his father would ask the children what they had learned that day—a tradition Tom continues with his own sons to this day.

As the first born of three sons, Tom assumed responsibilities beyond his years. He began helping out at his father's construction business from a young age, in addition to running a newspaper route and helping his parents with housework. Because Tom's mother was regularly in and out of the hospital with medical issues while he was growing up, Tom often cared for his younger brothers and performed household duties to help share the burden with his father.

Tom applied the work ethic his parents instilled in him to his studies. After graduating near the top of his high school class, Tom became the first in his family to attend college. He enrolled at La Salle University, where he graduated with highest honors and a bachelor's degree in accounting in 1985. After graduation, Tom got a job with Peat Marwick Mitchell & Company—the predecessor company to KPMG—and he stayed an employee for 32 years, until his resignation in 2017 in connection with this matter.

---

[3] Letter from Mark Seal, dated April 8, 2020, at 2 (attached hereto as Exhibit 9).

Despite his demanding career responsibilities, Tom never compromised the commitment to his family that he forged as a boy.  Tom's sister-in-law Carolyn writes that Tom played a critical role in his parents' lives, explaining that he "was the consistent contact person, the one [his parents] depended on, the one who did whatever they needed done—from helping with financial matters, to mowing their lawn, unclogging toilets, or painting a room in their house."[4] As his parents became elderly and sick, Tom redoubled his efforts to support them, helping his father fight cancer by researching and coordinating treatment options, taking him to medical appointments at Memorial Sloan-Kettering in New York City, and traveling with him to Houston, Texas for a potential experimental treatment at MD Anderson Cancer Center.  After his father died in 2006, Tom helped his mother sell the family home and moved his mother into his own house.  He drove her to her dialysis treatments three times a week and ultimately remained at her bedside for days at the hospital before she died in 2012.[5]

Tom is also the devoted father of four sons.  His older sons are now adults:  Kyle, now 27, graduated from Rutgers Law School in May 2019 and is working at the Legal Aid Society, assisting the indigent with housing matters; Matthew, now 25, graduated from William Patterson University in May 2018 and is pursuing a career in environmental science; and Colin, now 25, graduated from John Jay College of Criminal Justice in May 2018 and hopes to become a police officer.  Kyle describes his father as "the person that [he] turn[s] to for advice," and adding that Tom always has been available to talk—"whether it was something important for school or just to discuss how [the] day was going."[6]  Colin similarly describes his father as "the first person [he] call[s] when dealing with any issue":

---

[4] Letter from Carolyn Dannels, dated April 6, 2020, at 1 (attached hereto as Exhibit 4).
[5] Ex. 4 (Letter from C. Dannels) at 3; Letter from Kimberly Whittle, dated April 8, 2020, at 5-6 (attached hereto as Exhibit 12).
[6] Letter from Kyle Whittle, dated April 7, 2020, at 1-2 (attached hereto as Exhibit 13).

> [My dad] is always able to suggest the correct course of action, give
> me a different perspective, or instill confidence in me that I had not
> known was possible.  Most importantly, he has never let me forget
> or doubt the fact that he loves me with every fiber of his being and
> that he wants nothing more to be a part of my life.[7]

Tom's youngest son is 11-year old ███████, whom Tom's wife Kimberly describes as

"the happiest and kindest little boy you would ever meet."[8]  In the wake of Tom's arrest,

Kimberly has assumed the role of sole breadwinner in the Whittle household, working long

hours six or seven days a week to establish her own business.  That has left Tom to be young

███████'s primary caregiver, taking him to and from school and extracurricular activities,

helping him with his homework, preparing his meals, coaching his little league team, and playing

an important role in the leadership of his Cub Scout troop.[9]

In her heartfelt letter to the Court, Tom's wife Kimberly describes Tom's unwavering

commitment to their family, both before and after his departure from KPMG.  Kimberly writes

that Tom "always worked long hours and poured his heart and soul into his work; and at the

same time couldn't wait to get home and spend his free time and vacation time" with her and

their sons.[10]  Now that Tom no longer works outside the home, in addition to caring for ███████,

Tom also plans and cooks the family's meals, does the grocery shopping, cleans, and does the

laundry.  He also cares for Kimberly's elderly mother, who lives in their family home, driving

her to medical appointments, running errands for her, and cooking her special meals.  Kimberly

explains, "Since Tom's termination from KPMG, I have been working around the clock,

---

[7] Letter from Colin Whittle, dated Aug. 10, 2020, at 1 (attached hereto as Exhibit 11).
[8] Ex. 12 (Letter from K. Whittle) at 9.
[9] Letter from Ron Bubnowski, dated Sept. 3, 2019, at 1 (attached hereto as Exhibit 3).
[10] Ex. 12 (Letter from K. Whittle) at 1.

six/seven days a week . . . .  This would not be possible if it were not for Tom agreeing to completely reverse roles with me in our family."[11]

As Kimberly writes, Tom is the "rock and foundation" of his family, both in good times and in bad.[12]  And Tom's family has been through more than its fair share of tragedies.  In 1998, Tom's younger brother Timothy died suddenly at the age of 33 after suffering a heart attack. Timothy's wife Carolyn was six months pregnant with the couple's first child, Charlotte, when Timothy died.  When Charlotte was born, Carolyn asked Tom to be her godfather.  In the twenty-one years since Timothy's death, Tom has never wavered in his dedication to Charlotte.  In her letter to the Court, Carolyn recounts how Tom "hauled himself and his sons at least two hours north on a regular basis" to attend Charlotte's ballet performances, and remembers the day when Tom served as Charlotte's sponsor when she was confirmed into the Catholic church, braving a flu and high fever to attend the ceremony.[13]  Carolyn also describes the important role Tom has played in her life, even though she has long been remarried, and in the lives of others:

> Tom has remained a consistent and supportive person in my life and Charlotte's life.  He extended himself to support me and my husband Jeff, when we dated and eventually married.  I've valued his counsel, especially after losing his brother, but really anytime I have needed him over the past 28 years; if I call him, he calls me back, and he does what he can to make himself available—no matter where he is.  He did this with his parents, and does this for his wife and sons, his brothers, his mother in law, me, my daughter, his nieces and nephews, and his relatives and friends.[14]

Tom's family was touched by tragedy again in early 2013, when █████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████

---

[11] Id. at 8-9.
[12] Id. at 1.
[13] Ex. 4 (Letter from C. Dannels) at 2-3.
[14] Id. at 2.

5



Timothy explains the difference that his uncle Tom has made in his life and in the lives of everyone in his family:

> I have never had a father figure in my life until my Uncle Tom.  He is by far the smartest best male influence.  It's a true blessing to have him in my life.  I don't know what I would do without his help for not only me but my family as well.  In 2013 my grandmother moved in with him and my Aunt Kim and it has never been a problem.  It's not every day you find such a kind loving honest man like Thomas Whittle.  He is so dear to this family it's hard imagine life if he wasn't always there.  Word[s] really can't express the love and devotion he has always shown and given this family.[17]

Tom has made a difference in so many people's lives, but his role as a father figure to Timothy is perhaps most significant.

---

[15] Letter from Ellen Bennett, dated Apr. 8, 2020, at 1 (attached hereto as Exhibit 1).
[16] *Id.*
[17] Letter from Timothy Bennett, dated Apr. 8, 2020, at 1-2 (attached hereto as Exhibit 2).

### B.    Tom's Professional Life

Throughout his life, Tom balanced his responsibilities as a father, husband, son, and uncle with his extremely demanding career at KPMG.  Tom's loyalty and work ethic are evident in his dedication to KPMG, where he spent his entire professional career of over thirty years.  As Tom's brother Pete writes, in today's world, that kind of career loyalty is rare.[18]  Tom began his career as a staff auditor and was promoted to partner in 1997.  One of Tom's former colleagues, Kevin Murphy, met Tom around this time, and recalls that

> Tom had a reputation as a Partner that was highly technical, ethical, and demanding. . . . I realized immediately that Tom's reputation was true.  Tom was a smart, technical professional who did not cut corners and was a stickler for following the rules.  It was quite a challenge working for Tom, but the benefits from the experience was invaluable.  There were no short cuts. . . .  I respect Tom for his knowledge, character and ethics.   He taught me not only the technical aspects of my job, but also doing the right thing.[19]

Tom's former colleague Qing Meyerson echoes that sentiment, crediting her mentor Tom for helping her to become the person she is today, and recounting his reputation as a "finance person with the highest integrity and independence standards."[20]

In 2008, Tom went to work at KPMG's national office as a liaison between the firm's engagement teams and the PCAOB's inspectors during audits, a position he held for three years, making the daily hours-long commute from his home in New Jersey to KPMG headquarters in Manhattan.



On his return,

---

[18] Ex. 15 (Letter from P. Whittle) at 1.
[19] Letter from Kevin Murphy, dated Apr. 10, 2020, at 1 (attached hereto as Exhibit 8).
[20] Letter from Qing Meyerson, dated Apr. 8, 2020, at 1 (attached hereto as Exhibit 7).

Tom faced significant challenges finding clients and rebuilding his audit practice, ███

████████████████████████████████████████████████████████████

█████████████████████████████████████████ After months of

struggling to obtain work and clients at the KPMG Short Hills branch office, Tom offered to

return to the national office in the demanding job of Partner-in-Charge of Inspections.

Tom's new job gave him the opportunity to serve the firm in a meaningful way, but it

was stressful and challenging.  The relationship between Tom's predecessor and the PCAOB had

deteriorated to the point where meetings between KPMG and the PCAOB sometimes devolved

into shouting matches.  These difficulties were compounded by KPMG's poor performance on

PCAOB inspections, which led to significant pressure from both the PCAOB and KPMG

executives for improvement.  It was against this backdrop that Tom ultimately made the wrong

decision to misuse confidential PCAOB information to KPMG's advantage.

## III.    THE OFFENSE CONDUCT

On October 29, 2018, Tom pleaded guilty, pursuant to a cooperation agreement with the

government, to the five counts with which he was originally charged in this case, all of which

arose from his agreement with his former colleagues to misappropriate and misuse confidential

PCAOB inspection information between 2015 and 2017.  Presentence Report ("PSR"), Dkt. No.

495 (S.D.N.Y. Nov. 18, 2020) ¶¶ 1-6.  Tom began cooperating with the U.S. Attorney's Office in

July 2018, and ultimately testified extensively about his conduct and that of his co-defendants at

the trial of David Middendorf and Jeffrey Wada in February 2019.

It bears emphasizing that Tom's offense conduct is anomalous not only in the context of

his personal and professional life, but also because he did not benefit financially from his

actions.  As the Court heard during the trial, Tom and his co-defendants used the confidential

PCAOB information in order to help KPMG perform better on its audits, not for their own personal gain.

## IV.     THE PRESENTENCE REPORT'S GUIDELINES CALCULATION AND RECOMMENDATION

The Probation Office ("Probation") calculates Tom's Sentencing Guidelines range as 27 to 33 months' imprisonment.  PSR ¶ 111.  That calculation is consistent with the government's view set forth in its sentencing letter, *see* Government Sentencing Letter ("5K Letter"), October 30, 2020, at 3-4, and with the calculation the Court applied at the sentencing of Tom's co-defendant Cindy Holder, the only other defendant to have been convicted of Count One, *see* Holder Sentencing Tr., Dkt. No. 389 (S.D.N.Y. Aug. 22, 2019), at 16.

Probation has recommended a variance down from this range to a sentence of time served.  PSR at 27, 30.  In its Justification, Probation relies on the information provided in the 5K Letter, the non-violent nature of the offense, and the fact that "the defendant has been in compliance with the conditions of release and has no prior criminal record."  *Id*. at 30.  Probation thus concluded that "the sentencing goals of punishment, protection of the community, and deterrence will be best achieved by the imposition of a sentence of Time Served."  *Id*.  As set forth in more detail below, we respectfully submit that the Court should follow Probation's recommendation in this case.

Consistent with the other defendants in this case, Tom objects to the restitution calculation set forth in the PSR at paragraphs 123-124 and pages 28, 29, and 24.  We do not believe that the PCAOB's personnel costs can be considered "pecuniary" losses under the relevant statute, 18 U.S.C. § 3663A(c)(1)(B), since the PCAOB's remedial work was performed by salaried employees.  We await the Court's ruling on this issue.  We also note that Probation did not set out a schedule of restitution payments for Tom. █████████████████

9

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████   We ask the Court to bear this in mind when setting the

payment schedule for Tom.

## V.      SENTENCING ANALYSIS

The Supreme Court held in *United States* v. *Booker* that the Sentencing Guidelines are

"effectively advisory."  543 U.S. 220, 245 (2005).  Therefore, although sentencing courts must

give fair consideration to the Guidelines, they "are not to 'presume that the Guidelines range is

reasonable,' and instead they 'must make an individualized assessment based on the facts

presented.'"  *United States* v. *Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (quoting *Gall* v.

*United States*, 552 U.S. 38, 50 (2007)); *see also United States* v. *Stewart*, 590 F.3d. 93, 153 (2d

Cir. 2009) (explaining that "a sentence outside the Guidelines carries no presumption of

unreasonableness" and "the Guidelines are only one of the factors to consider when imposing

sentence").  "District courts are to use the Guidelines as a 'starting point,' and then make an

independent sentencing determination, taking into account the 'nature and circumstances of the

offense and the history and characteristics of the defendant,' and all of the statutory factors"

articulated in Title 18, United States Code, Section § 3553 (a).  *Thavaraja*, 740 F.3d at 259

(quoting 18 U.S.C. § 3553(a)(1); *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008)).

The mandate of Section 3553(a) is for the Court to "impose a sentence sufficient, but not

greater than necessary," to vindicate the purposes of sentencing.  18 U.S.C. § 3553(a).

Particularly in light of Tom's cooperation and the government's anticipated motion for a

downward departure from the Guidelines Range pursuant to Section 5K1.1 of the Guidelines, we

respectfully submit that any sentence higher than time served would be greater than necessary to

fulfill the purposes of sentencing.  U.S.S.G. § 5K1.1.  Moreover, the Section 3553(a) factors uniformly counsel in favor of a non-custodial sentence.

### A.        A Non-Custodial Sentence Is Warranted Because Tom Provided Substantial Assistance to the Government

Tom's cooperation in this matter was simply exceptional.  He provided timely, detailed, and truthful information that corroborated key aspects of the government's proof.

Section 5K1.1 of the Guidelines delineates five factors for the Court to consider in determining the appropriate reduction for Tom's substantial assistance: "(1) the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; [and] (5) the timeliness of the defendant's assistance."  U.S.S.G. § 5K1.1.  Applying these factors to Tom's case clearly justifies a sentence of time served.

### 1.        The Significance and Usefulness of Tom's Assistance

Tom's cooperation in this matter was highly significant and extremely useful.  According to the government, Tom was a "key witness," whose testimony was "critical" to the conviction after trial of his co-defendants David Middendorf and Jeffrey Wada.  *See* 5K Letter at 5, 6.  The government opines that "[t]here is no question that Whittle's clear, credible, and corroborated testimony significantly aided the jury in reaching its guilty verdict."  *Id*. at 5.

Of particular importance was the fact that Tom corroborated information and testimony provided by Brian Sweet, the government's other cooperating witness in this matter.  Sweet's cooperation had more hiccups than Tom's—shortly before trial, Sweet signed a supplemental cooperation agreement encapsulating additional criminal conduct he had belatedly revealed to

11

the government, including filing false tax returns and committing mortgage fraud.  As the government acknowledges, Sweet came under heavy attack from the trial defendants' attorneys, who questioned whether any of the information Sweet provided was truthful given that he had withheld key information relating to his own conduct.  *See* 5K Letter at 5.  Tom, on the other hand, was solid as a rock on the witness stand, unflappable and untouched by cross-examination because of the consistent, detailed, and accurate nature of his testimony.  The fact that Tom's obviously truthful testimony was largely consistent with Sweet's was extremely helpful to the government's case.  *See* 5K Letter at 5 ("Whittle was also able to corroborate huge swaths of the testimony of the Government's other cooperating witness, Brian Sweet, which was especially significant given the trial defendants' specific attacks on Sweet's credibility.").

Tom not only corroborated Sweet's information and testimony, but also "provided information about significant conversations about which the Government was otherwise unware."  *See* 5K Letter at 4.  Tom was able provide this information due to his status as a member of KPMG's senior management and close colleague of Middendorf—a perspective Sweet was unable to provide, but that was crucial to the government's success at trial.  The government provides four examples of such information in its 5K Letter.  *See id.* at 4-5.  Tom also pointed the government to numerous key documents that proved his co-defendants' roles in the scheme, including emails between Tom and Middendorf in which they used code words about specific audits they were targeting for re-reviews.  Tom deciphered and later testified about the codes for the government, providing key evidence of Middendorf's knowledge that his conduct was wrong, thus rebutting his central defense at trial.[21]  In addition, Tom informed the

---

[21] *See* GX 949; Middendorf Trial Tr. 1891-93 (March 28, 2016 email from Tom to Middendorf relating to the re-review of Fidelity Information Systems); GX 950; Middendorf Trial Tr. 1888-91 (March 28, 2016 emails between Middendorf and Tom relating to the re-review of Bon Ton); GX 951; Middendorf Trial Tr. 1893-95 (March 29,

government about a pivotal December 2014 meeting between members of the PCAOB Board and KPMG's most senior executives.  He recounted how this meeting was a "punch in the gut by the PCAOB" and how, in response, KPMG undertook significant efforts to address the PCAOB's criticisms, eventually leading to the criminal conduct in this case.[22]  This critical information helped the jury understand why Tom and his co-defendants ultimately succumbed to the temptation of accepting Sweet's offer of confidential information.

According to the government, Tom's cooperation also likely "played a significant role" in the decisions of David Britt and Cynthia Holder to plead guilty.  *See* 5K Letter at 5.  Although Holder pleaded guilty before Tom testified, Tom's cooperation was publicly known at the time she entered her plea.  While Holder may have been willing to risk going to trial when the government had only one cooperating witness, two may have tipped the scales for her in favor of a guilty plea.   Britt was able to listen to Tom's devastating testimony at the Middendorf and Wada trial, in which Tom recounted the use of the term "stealth re-reviews" by a member of Britt's team,[23] and explained the emails reflecting the decision Tom and Britt made to re-review four additional engagements in order to hide KPMG's possession of the 2016 inspection list.[24] Tom's matter-of-fact recitation of Britt's involvement in the charged crimes undoubtedly played a significant role in persuading Britt to plead guilty in advance of his own trial.

### 2. The Truthfulness, Completeness, and Reliability of Tom's Information and Testimony

Tom's trial testimony was "clear, credible, and corroborated"—a textbook example of a cooperator providing truthful information.  *See* 5K Letter at 5.  Defense counsel were unable to

---

2016 emails between Middendorf and the engagement team, and between Middendorf and Tom relating to the re-review of Macquarie); GX 952; Middendorf Trial Tr. 1895-97 (March 29, 2016 emails between Britt and Tom, and between Tom and Middendorf relating to the re-review of Sallie Mae).

[22] Middendorf Trial Tr., Dkt. No. 305 (S.D.N.Y March 13, 2019), at 1840-44.

[23] Middendorf Trial Tr. 1897-1901.

[24] GX 948; Middendorf Trial Tr. 1901-05.

impeach him on a single issue, and instead generally used him to corroborate ancillary points they wanted to make. As set forth above, Tom's no-nonsense testimony was particularly important to the government's case once it was revealed that Brian Sweet had lied to the government during the cooperation process by concealing his prior filing of false tax returns and commission of mortgage fraud. Tom had no similar baggage, and he was an open book to the government throughout the cooperation process. According to the government, from the outset of Tom's cooperation, he was "well-prepared, forthcoming and credible." *See* 5K Letter at 4. Tom debriefed with the government extensively in advance of trial, even informing the prosecutors of his concern that he might have failed to pay taxes on his housekeeper—a concern that turned out to be unfounded when he consulted separately with a third party who informed him that she was an independent contractor.[25]

Tom never attempted to minimize his role or shift blame onto someone else. As the government wrote, "Whittle never attempted to excuse or justify his behavior. From the beginning, he accepted full responsibility for his criminal conduct." *See* 5K Letter at 4. Indeed, from the moment KPMG began investigating his actions in 2017, Tom was forthright about his conduct. Unlike some of his co-defendants, he never told lies to KPMG investigators, destroyed documents or evidence, or conspired with others to conceal his conduct.

### 3.    The Nature and Extent of Tom's Assistance

Not only was Tom's cooperation significant, useful, and truthful, it was also wide-ranging and extensive. Over a seven-month period, Tom had nearly a dozen meetings with the government, often in marathon sessions lasting as many as six hours at a time. Tom always made himself available when the government needed him, and in between meetings he spent

---

[25] *See* Middendorf Trial Tr. 1936-37.

significant time reviewing documents and analyzing relevant materials in order to help the government identify the most important documents for its case.  As just one example, Tom directed the government to a draft script for a September 2016 meeting in which he, Middendorf, Britt, and other senior executives at KPMG made inaccurate and misleading statements to the PCAOB.  Specifically, the presentation falsely attributed KPMG's improved results during the PCAOB's 2016 inspection to its root cause analysis and monitoring program, and it omitted the success of the re-reviews in avoiding comments during the inspections.  The government ultimately introduced this script at trial as evidence of Middendorf's criminal intent.[26]  And as discussed above, in addition to corroborating Sweet's information, Tom told the government about numerous other key facts and documents that it ended up relying on in its case-in-chief.

Just as Tom's preparation for his testimony was extensive, so was his testimony itself. He was on the witness stand over a two-day period, and provided information about the entire scope of the charged conspiracies.  For the duration, he answered the government's and the defense attorneys' questions patiently, calmly, and accurately, treating each questioner with equal respect.  Although this must have been exhausting, Tom's attention to detail and concentration never flagged.

### 4.    Injury Suffered Resulting from Tom's Cooperation

Although Tom is fortunate that his cooperation has not endangered himself or his family, it nonetheless has been a challenging experience.  Rather than simply pleading guilty, Tom chose to assist the government and engage in the arduous process of debriefing, preparing for trial, and then testifying.  His testimony required him to publicly confess his wrongdoing.  He was obligated to plead guilty to five felony offenses, and to testify against his former colleagues and

---

[26] *See* GX 1310; Middendorf Trial Tr. 1915-18.

friends.  Tom knew that doing so would cause him to lose many friendships, as well as the respect of some of his peers and former colleagues—on top of already having lost his career and destroyed his professional reputation by having committed the crimes of conviction.  Nevertheless, Tom was committed to fully accepting the consequences of his actions, and to righting the wrongs he had caused by helping the government.

### 5.      The Timeliness of Tom's Assistance

Tom's cooperation was timely—in fact, it came at a particularly helpful juncture for the government, just as it was starting to solidify its case in preparation for an eventual trial.  The Court denied the defense motion to dismiss the indictment on July 17, 2018—a motion that raised complex and novel issues well worth litigating.   *See* Dkt. No. 114, No. 18 Cr. 36 (JPO) (S.D.N.Y. July 17, 2018).  Tom approached the government to propose cooperation just one week later, on July 25, 2018, and his first proffer was on July 30, 2018.  Tom's immediate readiness allowed the government to fully debrief him and make use of his extensive information well in advance of the trial, which began in February 2019.  In addition, as the government observes, "because Whittle's cooperation was publicly known *far before trial*, it is likely that knowledge of his cooperation played a significant role in the decision of Holder, and later Britt, to plead guilty."   *See* 5K Letter at 5 (emphasis added).

In sum, all of the Section 5K1.1 factors counsel in favor of a substantial departure from the Guidelines range.  It would not be an understatement to say that Tom was the ideal cooperator.  The Court should reward him accordingly by imposing a sentence of time served.

### B.      A Non-Custodial Sentence Would Be Fair and Appropriate Under Title 18, United States Code, Section 3553 (a)

A sentence of time served would also be sufficient, but not greater than necessary, to serve the purposes of 18 U.S.C. § 3553(a), given Tom's status as a non-violent, first-time

offender who, with the exception of this case, has lived an admirable life devoted to his family and career.  Such a sentence also would prevent any unwarranted disparities with sentences that were imposed on Tom's co-defendants, including David Britt, who received a non-custodial sentence of six months' home confinement, and fellow cooperating witness Brian Sweet, who received a sentence of time served.

    **1.**    **Tom's Personal History and Characteristics Justify a Sentence of Time Served Under Title 18, United States Code, Section 3553 (a)(1)**

As recounted in Section II of this Memorandum, Tom has led a life characterized by his dedication to his family and his commitment to hard work.  Despite experiencing more than his fair share of personal tragedies and challenges—including the sudden death of his younger brother, ████████████████████████████████████████████████████████████ ████████████████—Tom has remained steadfast and strong, performing remarkable acts of kindness and compassion for others throughout his lifetime.  Tom is an honorable man who let the stress of his job get the better of his judgment and character.  He deeply regrets his conduct, and he has attempted to atone for it by cooperating with the government, and by devoting every day to supporting his family in all the ways he can.

Tom's family members very much need him in their lives.  He is the primary caregiver for his youngest son and mother-in-law, as his wife Kimberly now works full-time to provide financially for the family.  Removing Tom from his home would have a devastating impact on the delicate balance of their family unit, and cause serious harm to the lives of his son and mother-in-law.  Kimberly writes:

> Please consider [Tom's] ongoing role as the foundation of our loving family and the critical care he provides for all of us — me, our boys, my mom and our nephew.  Most importantly, I implore you to please, please, please consider the impact of Tom's sentencing on our [eleven]-year-old son. . . .  Tom being home to care for him is beyond critical to his development, health, well-being

17

> and feeling of safety and security.  I believe removing Tom from our
> home would result in an irrevocable traumatic experience for our
> family and especially our young son.[27]

In addition to the important role Tom plays in his home, we also have submitted letters from many other of Tom's family members, including his three older sons and nephew Timothy, who have pleaded with the Court to allow Tom to remain at liberty so he can continue to love and support them.

District courts have broad discretion to fashion lenient sentences to account for challenging family circumstances.  *See, e.g.*, *United States* v. *Galante*, 111 F.3d 1029, 1034 (2d Cir. 1997) (affirming variance where removal of the father from the family would severely limit the education and upbringing of children).  We respectfully request that this Court consider the collateral consequences that Tom's incarceration would have on the lives of his loved ones who depend on him for their care, and impose a non-custodial sentence that would allow him to remain with his family.

> **2.      A Non-Custodial Sentence Would Promote Respect for the Law,
> Provide Specific and General Deterrence, and Protect the Public**

Section 3553(a)(2) contemplates the need for the sentence imposed to reflect the seriousness of the offense and to protect the public from further crimes by the defendant.  In the case of a cooperating witness like Tom, a sentence of time served is sufficient to satisfy these objectives.

First, the likelihood of Tom recidivating is zero.  There is no need for specific deterrence, or to protect the public from Tom.  Indeed, the Second Circuit has specifically observed that cooperation "reduces the need for rehabilitation and deterrence."  *Stewart*, 590 F.3d at 141. With the exception of the instant offense, Tom has led a completely law-abiding life, with an

---

[27] Ex. 12 (Letter from K. Whittle) at 9.

unblemished record of hard work and service to others.  Additionally, Tom will never again be in

a position to commit a similar crime: he is no longer a certified public accountant, he will never

be employed as an accountant or an auditor in the future, and he will very likely be permanently

barred from serving as a public accountant.  *See United States* v. *Gaind*, 829 F. Supp. 669, 671

(S.D.N.Y. 1993) ("Elimination of the defendant's ability to engage in similar or related

activities—or indeed any major business activity—for some time, and the substantial loss of

assets and income resulting from [his crime] have decreased for the foreseeable future his ability

to commit further crimes of the type he was tempted to undertake, and constitutes a source of

both individual and general deterrence.").  Moreover, Tom has served nearly three years under

pretrial supervision without incident.  There is no reason to believe he will ever have another

brush with the law.

Second, any sentence involving a term of incarceration would be greater than necessary

to provide general deterrence, reflect the seriousness of the offense, and provide just punishment.

Because of the extensive publicity this case already has received,[28] it is fair to say that the public

already has been informed of the gravity of the charged crimes and the serious consequences for

those who committed them.  Tom's entire livelihood—which he worked tirelessly over 32 years

to establish—has been destroyed, which is punishment enough for him.

---

[28] *See, e.g.*, Dave Michaels, et al., *KPMG Fires Partners Over Leak of Audit Regulator's Confidential Plan*, WALL ST. J. (Apr. 11, 2017); Chad Bray, *KPMG Fires 6 Over Ethics Breach on Audit Warnings*, N.Y. TIMES (Apr. 12, 2017); Matthew Goldstein, *U.S. Accuses Accountants of Trying to Game Reviews of KPMG Audits*, N.Y. TIMES (Jan. 22, 2018); Michael Rapoport, *Former KPMG Partner Pleads Guilty in Scheme to Obtain Secret Regulatory Information*, WALL ST. J. (Oct. 30, 2018); Michael Rapoport, *KPMG Ex-Partner Goes on Trial in 'Steal the Exam' Scandal*, WALL ST. J. (Feb. 11, 2019); Michael Rapoport, *KPMG Ex-Partner Convicted In 'Steal the Exam' Scandal*, WALL ST. J. (Mar. 11, 2019); Mark Maurer, *Another Former KPMG Executive Pleads Guilty in 'Steal the Exam' Scheme*, WALL ST. J. (Oct. 4, 2019).

Finally, a sentence of time served here would promote respect for the law by signaling to the public that cooperating with the government is rewarded when defendants approach that effort with absolute truthfulness and the utmost care, as Tom did in the case.

### 3.      A Non-Custodial Sentence Would Avoid Unwarranted Sentencing Disparities

Any sentence involving a term of incarceration would create unwarranted sentencing disparities between Tom and his co-defendants and conflict with the principles articulated in Section 3553(a)(6).  Five defendants already have been sentenced in this case.  David Middendorf and Jeffrey Wada were convicted after trial, and were respectively sentenced to a year and a day's imprisonment, and nine months' imprisonment.[29]  Cynthia Holder, who pleaded guilty in October 2018, received a sentence of eight months' imprisonment.[30]  David Britt, who pleaded guilty in October 2019 in advance of his scheduled trial, received a sentence of six months' home confinement.[31]  Brian Sweet, who pleaded guilty in January 2018 and cooperated with the government's investigation, received a sentence of time served.[32]

In light of Tom's extraordinary cooperation, which was critical to the government's victory at trial, he should receive a lower sentence than any of his non-cooperating co-defendants.  Because Britt received a non-custodial sentence, so too should Tom.[33]  Indeed, in order to take account of the value of his cooperation, the Court should impose a lesser sentence on Tom than it did on Britt, and not require any period of home confinement.

---

[29] *See* Middendorf Sentencing Tr., Dkt. No. 418 (S.D.N.Y. Sept. 23, 2019), at 29; Wada Sentencing Tr., Dkt. No. 441 (S.D.N.Y. Oct 21, 2019), at 30-32.

[30] Holder Sentencing Tr., Dkt. No. 389 (S.D.N.Y. Aug. 22, 2019), at 33-34.

[31] Britt Sentencing Tr., dated Oct. 9, 2020, at 17.

[32] Sweet Sentencing Tr., dated Nov. 20, 2020, at 17.

[33] The factors that this Court considered in imposing a non-custodial sentence on Britt similarly apply to Tom: like Britt, Tom was "not an instigator, or mastermind, or leader of the offense," was "not directly involved in taking the confidential information from the PCAOB, although he was involved in using it," and was "not as senior as others" (i.e., Middendorf) involved in the scheme at KPMG.  Britt Sentencing Tr. 16.

A sentence of time served would also be fair and appropriate given that Brian Sweet received such a sentence. The Court found that Sweet's cooperation was the most important factor in the sentencing analysis, stating that his "cooperation was certainly substantial, and his sentence must reflect that assistance."[34] We respectfully submit that Tom has also earned a non-custodial sentence as a result of his cooperation, which the government termed as "critical" to the convictions of his co-defendants at trial. *See* 5K Letter at 6. Tom should receive a sentence of time served to ensure no unwarranted disparity between himself and Sweet. And although the Court did impose a term of supervised release on Sweet, we respectfully submit that the Court should consider foregoing such a term for Tom, given that his cooperation was entirely without incident (as opposed to Sweet's), and in light of Tom's nearly three years of unblemished pretrial supervision.

Finally, aside from this case, courts in this District routinely grant non-custodial sentences to defendants in white collar cases who provide extensive and useful cooperation to the government. For example:

- <u>Timothy Parietti</u> and <u>Michael Curtler</u>: Parietti and Curtler were cooperating witnesses who testified at the trial of Matthew Connolly and Gavin Black, which involved a multi-year scheme to use Deutsche Bank's LIBOR submissions to rig the LIBOR and boost the bank's derivatives trades. Parietti and Curtler both received sentences of time served. *See* Dkt. No. 20, No. 16 Cr. 373 (PAE) (S.D.N.Y. Feb. 13, 2019); Dkt. No. 26, No. 15 Cr. 670 (CM) (S.D.N.Y. Apr. 10, 2019).

- <u>Gordon Johnston</u>: Johnston testified as a cooperating witness in connection with an insider trading scheme in which he funneled nonpublic drug approval information to a portfolio hedge fund manager, Stefan Lumiere, who used that information to earn approximately $25 million. Johnston was sentenced to time served. *See* Dkt. No. 22, No. 16 Cr. 406 (ALC) (S.D.N.Y. Jan. 25, 2018).

- <u>Richard Cunniffe</u>: Cunniffe testified as a cooperating witness in connection with an insider trading scheme in which Cunniffe and his colleague made nearly $1.2 million in profits by trading on inside information about pending health care company deals.

---

[34] Sweet Sentencing Tr., dated Nov. 20, 2020, at 16.

Cunniffe was sentenced to one year of probation and 100 hours of community service. *See* Dkt. No. 261, No. 15 Cr. 287 (LTS) (S.D.N.Y. Nov. 8, 2017).

- Takayuki Yagami:  Yagami, a derivatives trader who worked with others to make to make fraudulent yen Libor submissions, cooperated with the government and received a sentence of time served.  *See* Dkt. No. 282, No. 14 Cr. 272 (JSR) (S.D.N.Y. Mar. 13, 2017).

Just as these defendants were granted non-custodial sentences in light of their substantial cooperation in white collar cases, Tom should receive a sentence of time served.  Tom is arguably even more deserving of such a sentence, as his crime was motivated not by greed, but by his desire (however misguided) to advance the interests of his employer.

### C.    The Sentencing Guidelines Overstate the Seriousness of this Atypical Offense

A non-custodial sentence is further warranted because the Guidelines range in this case overstates the seriousness of the offense and is greater than necessary to effectuate the purposes of sentencing.  As this Court previously has acknowledged, this case is "not like typical fraud cases," because the defendants did not commit the crimes of conviction in order to "line [their] pockets."[35]  The Guidelines here are primarily driven by the large monetary loss allegedly suffered by the PCAOB—but because Tom did not benefit financially from his actions, and he was not motivated by monetary gain, the range does not accurately correspond to the nature of his criminal conduct.  *See United States* v. *Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (explaining that the Guidelines' "arithmetic approach" is particularly ill-suited in cases where the calculated loss is often arbitrary and attenuated from the defendant's actual conduct).  As such, the Court need not and should not rely heavily on the Guidelines range as a benchmark for calculating Tom's sentence.

---

[35] Holder Sentencing Tr. 31-32.

**D.     A Custodial Sentence Would Expose Tom to the Potential Risk of Serious Illness Caused by COVID-19**

A non-custodial sentence is particularly critical for Tom ████████████

 Additionally, the risk of developing severe illness from COVID-19 increases with age,[37] and men die from COVID-19 caused illness at more than double the rate that women do.[38]

Studies have shown that the likelihood of contracting the virus in prisons is at least 5.5 times higher than within the general U.S. population.[39]  This figure may even be an

---

[36] Although the effect of COVID-19 on individuals with autoimmune disorders has not been determined with any certainty, there do appear to be troubling connections between the two conditions.  *See COVID-19 and Autoimmune Disease: What We Know*, Global Autoimmune Institute, https://www.autoimmuneinstitute.org/covid-19-autoimmune-disease-what-we-know-now/ ("There are instances in which having an autoimmune disease increases vulnerability to COVID-19 complications, and other cases in which having a coronavirus infection may trigger autoimmune or other serious conditions.").

[37] *See Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html ("As you get older, your risk for severe illness from COVID-19 increases . . . [t]here are also other factors that can increase your risk for severe illness, such as having underlying medical conditions"); *COVID-19 Hospitalization and Death by Age*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (the hospitalization rate of adults ages 50-64 years is 4x higher than that of 18-29 year olds, and the death rate of adults ages 50-64 years is 30x higher than that of 18-29 year olds).

[38] *See Men and COVID-19: A Biopsychosocial Approach to Understanding Sex Differences in Mortality and Recommendations for Practice and Policy Interventions*, CDC, https://www.cdc.gov/pcd/issues/2020/20_0247.htm.

[39] *See, e.g.*, Brendan Saloner, Ph.D., et al., Research Letter, *COVID-19 Cases and Deaths in Federal and State Prisons*, 324 JAMA 602 (2020), *available at* https://jamanetwork.com/journals/jama/fullarticle/2768249.

underestimate, given that reported case rates "likely understate[] the true prevalence of COVID-19 in prisons" due to uneven testing rates.  *Id.*  As of November 17, at least 197,659 people in United States prisons had tested positive for the virus, and the number of prison infections has recently begun to rise again as the country faces a surging wave of cases.[40]

Prisons, which have been described as "petri dishes for contagious respiratory illnesses,"[41] make close contact with others "unavoidable" and are often "overcrowded, poorly ventilated, and unsanitary," making them "epicentres for infectious diseases."[42]  In *United States* v. *Cooper*, this Court commented that "[b]ecause it is virtually impossible to enforce effective physical distancing in a prison setting with shared cells, shared bathrooms, and shared dining facilities, the risk of spread of the coronavirus is significantly increased in prison."  No. 13 Cr. 66 (JPO), 2020 WL 4195273, at *2 (S.D.N.Y. June 11, 2020).

As the Court noted at Sweet's sentencing, "there are times when [incarceration] is necessary and there are times when it's not."[43]  We respectfully submit that incarceration is not necessary in Tom's case in light of all of the above factors, and especially given that it could significantly increase the risk that he will contract COVID-19 and potentially suffer serious complications therefrom.  As set forth in the rest of this memorandum, a sentence of time served would satisfy the purposes of sentencing without unnecessarily exposing him to the possibility of severe illness or even death.

---

[40] *See A State-by-State Look at Coronavirus in Prisons*, Marshall Project, https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last visited Nov. 25, 2020).
[41] *See United States* v. *Park*, 456 F. Supp. 3d 557, 560 (S.D.N.Y. Apr. 24, 2020) (citing *Letters to the Editor: A Prison Doctor's Stark Warning on Coronavirus, Jails and Prisons*, L.A. TIMES (Mar. 20, 2020), *available at* https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration).
[42] Stuart A. Kinner et al., Comment, *Prisons and Custodial Settings are Part of a Comprehensive Response to COVID-19*, 5 Lancet E188 (2020), *available at* https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(20)30058-X/fulltext.
[43] Sweet Sentencing Tr. 16.

## VI.    CONCLUSION

Tom deeply regrets the lapse in judgment that led to the crimes he committed in this case. He will never be able to undo the damage he did to the auditing profession, his family, and his community.  But Tom is now aware of his limitations, and he began the process of making amends for his misconduct by accepting responsibility for his crimes and cooperating with the government.  His cooperation was critical in securing the convictions of each of his four co-defendants.  Tom now will continue his rehabilitation by redoubling his dedication to his family and his community.  We respectfully submit that the Court should allow him to do so without interruption by imposing a sentence of time served, in accordance with Probation's recommendation.

Dated:  November 25, 2020  
       New York, New York

Respectfully submitted,

/s/ Bradley J. Bondi  
Bradley J. Bondi  
Nola B. Heller  
Sean P. Tonolli (*pro hac vice*)  
CAHILL GORDON & REINDEL LLP  
32 Old Slip  
New York, NY 10005  
Tel: (212) 701-3008  
bbondi@cahill.com

*Attorneys for Defendant Thomas Whittle*